**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

THOMAS BRYAN, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

O-I GLASS, INC., GORDON J. HARDIE, and JOHN A. HAUDRICH,

Defendants.

Case No.

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**CLASS ACTION**

Demand for Jury Trial

Plaintiff Thomas Bryan ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by O-I Glass, Inc. ("O-I Glass" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of O-I Glass public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired O-I Glass common stock between March 14, 2025, to July 28, 2026, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities. (the "Class").

2. Defendants provided investors with material information concerning O-I Glass' expected financial outlook for 2026, including its expectations for adjusted EBITDA and free cash flow, as well as growth expectations for its glass-packaging business. Defendants' statements included, among other things, confidence in O-I Glass' ability to drive growth through its Fit to Win initiative, emphasizing "a more premium and resilient business portfolio" and disciplined pricing, while navigating challenges in its European operations.

3. Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of O-I Glass' Fit to Win program, including the delay in achieving its targeted cost savings, higher than expected expenses, operational disruptions that materially offset Fit to Win benefits, and continued competitive and energy-cost pressures affecting its European operations. Such statements absent these material facts caused Plaintiff and other shareholders to purchase O-I Glass' securities at artificially inflated prices.

4. The truth emerged after the market closed on July 28, 2026 when O-I Glass announced its second quarter 2026 financial results, substantially reducing its 2026 adjusted EBITDA and free cash flow guidance and realigning its 2027 Investor Day financial targets.

5. Investors and analysts reacted immediately to O-I Glass' revelation. The price of O-I Glass' common stock declined from a closing market price of $9.06 per share on July 28, 2026, O-I Glass' stock price fell to $7.70 per share on July 29, 2026, a decline of about 15%.

## JURISDICTION AND VENUE

6. Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as a significant portion of Defendant O-I Glass' business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11. Plaintiff purchased O-I Glass common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in O-I Glass is attached hereto.

12. O-I Glass, Inc. is an Ohio corporation with its principal executive offices located at One Michael Owens Way, Perrysburg, Ohio 43551. During the Class Period, the Company's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "OI."

13. Defendant Gordon J. Hardie ("Hardie") was, at all relevant times, the President, Chief Executive Officer and Director of O-I Glass.

14. Defendant John A. Haudrich ("Haudrich") was, at all relevant times, the Senior Vice President and Chief Financial Officer Executive of O-I Glass.

15. Defendants Hardie and Haudrich are sometimes referred to herein as the "Individual Defendants." O-I Glass together with the Individual Defendants are referred to herein as the "Defendants."

16. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of O-I Glass' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

17. O-I Glass is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

18. The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to O-I Glass under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

19. O-I Glass is a global manufacturer of glass containers for food, beverages and pharmaceuticals, serving customers in the United States, Europe and other international markets. Its products include glass containers for beer, spirits, wine, food, soft drinks, teas, juices, and pharmaceuticals.

### *The Defendants Materially Misled Investors Concerning O-I Glass' 2026 Financial Outlook and European Operations*

*March 14, 2025*

20. On March 14, 2025, Defendants held an Investor Day call and emphasized O-I Glass' strategy to improve competitiveness through its Fit to Win initiative and reducing unnecessary costs which management forecasted would increase earnings and cash flow. Notably, the Company reaffirmed its 2027 financial targets and introduced new 2029 objectives with Defendant Hardie stating, in pertinent part:

> ***[w]e are reaffirming our 2027 commitment of $1.45 billion EBITDA, free cash flow of 5% of revenue, and a 2% economic spread.*** And we're also setting out today what we're calling preliminary targets for 2029. We see a clear path to lifting EBITDA to $1.65 billion delivering free cash flow of 7% of revenue and expanding our economic spread to at least 4%.

(Emphasis added).

21. Moreover, O-I Glass' Senior Vice President for Business Operations Europe, Emmanuelle Guerin, emphasized the Company's strategic shift to drive greater profitability, stating, in relevant part:

> We, today, ***ambition to grow our premium portfolio from 27% to 40%, knowing that premium markets returned 30% above average margin. This is a way for us to create value.*** The way we're driving that differentiation is leveraging the Fit to Win, the cost savings Eduardo outlined previously and making and turning this into a ***systematic way to realign our network, our capital, and our resources to be the lowest cost for premium for -- sorry, the lowest costs for mainstream and the best cost for premium.***

(Emphasis added).

*April 29, 2025*

22. On April 29, 2025, Defendants issued a press release announcing first quarter 2025 results, Defendants reported a strong performance with an increase in shipments "across both the Americas and Europe" and "achieved $61 million in Fit to Win benefits" which exceeded management expectations. Defendants further reaffirmed 2025 guidance, anticipating "adjusted earnings will increase between 50 to 85 percent from 2024 levels."

23. On April 30, 2025, Defendants conducted the corresponding earnings call. Defendant Hardie opened the call touting O-I Glass' "stronger-than-anticipated sales volume and Fit to Win benefits." In pertinent part, he highlighted the Company's positive developments as follows:

> ***Market conditions have continued to gradually recover, and our shipments increased by more than 4% compared to last year. Additionally, our Fit to Win program generated savings of $61 million, which was a significant contributor to our better-than-expected results.***
>
> Strong demand and initiative benefits helped offset expected headwinds, including lower net price and scheduled temporary production curtailments.

> Looking at our business units, segment operating profit improved significantly in the Americas, reflecting healthier fundamentals and benefits from strategic initiatives.
>
> * * *
>
> ***Overall, we are off to a strong start this year and are successfully managing the elements within our control. As such, we are reaffirming our full year 2025 guidance and expect adjusted earnings to improve between 50% and 85% from 2024.***

(Emphasis added).

24. On the same call, Defendant Haudrich acknowledged a downward trend in Europe that was partially offset by the Fit to Win benefits and maintained that the results should improve in the second half of 2025, stating in pertinent part:

> Consistent with our expectations, earnings were down in Europe. While sales volume was up nearly 4%, net price was ahead reflecting competitive pressures and excess capacity.
>
> We did incur about $58 million of unabsorbed fixed costs as we curtailed significant capacity to draw down inventories, which was partially offset by $20 million of Fit to Win benefits as well as other savings.
>
> ***Importantly, results should improve in the second half of the year, as inventory reduction activities moderate, and we generate greater initiative benefits, following current restructuring actions.***
>
> * * *
>
> ***In summary, we're off to a strong start this year. Despite some headwinds, results exceeded our expectations heading in the quarter, and we are well positioned for continued success throughout the year.***
>
> ***We are reaffirming our full year 2025 guidance.*** Adjusted earnings should range between $1.20 and $1.50 per share, which represents a 50% to 85% improvement from fiscal year 2024. Significantly higher adjusted earnings should reflect ongoing efforts to enhance our operational performance, reduce costs and capture market opportunities.

(Emphasis added).

25. During the question-and-answer segment of the call, Defendant Haudrich acknowledged the European headwinds describing them as front-loaded and temporary during the following pertinent exchange:

> <Q: Anthony James Pettinari – Citigroup, Inc. – Analyst> In Europe, you have year-over-year headwinds for net price and then operating costs with the curtailments in 1Q. As you envision the year, can you talk about maybe the cadence of how you'd expect those headwinds to trend and ultimately inflect over the 4 quarters of the year?
>
> <A: John A. Haudrich> ***As we take a look at net price for the business, it will be front-end loaded this year. So you saw the $37 million impact in the quarter, it should be less than that in the second quarter and then be a relatively minor headwind for the business in the back half of the year.*** That's primarily because last year, we had started to see a little bit of pricing pressure in the marketplace in the back half of last year. So we're going to comp that. So that will show a year-over-year moderation in that pressure point.
>
> ***And then when it comes to the curtailment cost, we believe that that also is going to be front-end loaded. We're trying to bring our inventories down to 50 days or lower. We're making good progress on that. If you take a look at just the calculations and everything on a year-over-year basis, the operating cost impact of that is, it peaks in the first quarter, we'll have some negative impact in the second quarter, not to the same degree in the first quarter and by the back half of the year, on a year-over-year basis, that's going to be a strong year-over-year headwind against obviously weaker comps in the prior year.***

(Emphasis added).

<u>*July 29, 2025*</u>

26. On July 29, 2025, Defendants issued a press release announcing second quarter 2025 results. The press release reported that "while demand increased in the Americas, it softened in Europe" with segment operating profit declining to $90 million due to "an approximately 9 percent drop in sales volume" and "higher operating costs due to increased temporary production curtailments aimed at reducing inventory."

27. Notwithstanding the European headwinds, Defendant Hardie reported "a strong second quarter 2025 performance, despite a sluggish demand environment" and raised full-year 2025 guidance, stating, in pertinent part:

> ***While reported earnings declined year-over-year due to restructuring charges, our adjusted earnings rose 20 percent compared to the second quarter of last year. Notably, the company's continued performance on Fit to Win initiatives to improve our competitive position has more than offset macroeconomic softness in several markets.***
>
> The company remains focused on executing against controllable factors—and the results reflect that discipline. Year-to-date, Fit to Win benefits have reached $145 million, reinforcing our confidence in achieving or surpassing the ambitious goals we set during our recent Investor Day. ***Given our strong performance and momentum, we are raising our full-year 2025 guidance and now anticipate adjusted earnings will increase 60 to 90 percent over 2024.***

(Emphasis added).

28. On July 30, 2025, Defendants conducted the corresponding earnings call. Defendant Hardie continued to praise O-I Glass' strong second quarter results while noting the European production curtailments as temporary, stating, in relevant part:

> To align supply with demand and manage inventory levels, temporary production curtailments remain in place across Europe with a continuing drag on our operating costs there. ***We remain engaged in consultations with European and local works councils on long-term network optimization initiatives aimed at addressing excess capacity in the fleet. These actions, when finalized, are expected to strengthen our competitive position and support sustainable profitable growth in Europe.***
>
> In July, our global shipments were down mid-single digits compared to July of last year, reflecting continued soft conditions plus the rephasing of some specific customer order activity and the delayed ramp-up of a reconfiguration project at a European plant. ***We continue to expect full year 2025 volumes to be in line with the prior year as shipment levels are projected to be stable across both the Americas and Europe. This outlook holds despite some intra-quarter fluctuations, which are primarily driven by comparisons to prior year performance.***

(Emphasis added).

29. On the same call, Defendant Haudrich highlighted that the expected operational improvements in Europe would improve the Company's cost competitiveness and improvement in free cash flow, stating, in pertinent part:

> In Europe, segment operating profit declined due to lower net price and softer sales volumes. Operating costs rose slightly due to the impact of ongoing production curtailments, but these were largely offset by Fit to Win savings. ***We expect performance in the region to improve progressively as our downtime decreases, network optimization actions deliver a better cost position and our cost competitiveness improves.***
>
> ***Given our strong year-to-date performance and momentum of the Fit to Win program, we have raised our full year 2025 guidance.*** We now expect adjusted earnings to range between $1.30 and $1.55 per share, representing a 60% to 90% improvement over fiscal year 2024. We also anticipate about a $300 million year-over-year improvement in free cash flow, driven by stronger operating results, reduced capital expenditures and lower inventories despite $140 million to $150 million in cash restructuring costs.

(Emphasis added).

30. During the question-and-answer segment of the call, Defendants confidently viewed Europe as stabilizing in the second half of 2025 during the following pertinent exchanges:

> <Q: Michael Andrew Roxland – Truist Securities, Inc. – Analyst> Gordon, you mentioned that in your comments that shipments were weaker in July and you cited rephasing of order activity and delayed ramp-up at a configurated plant. Do you have any sense what your order books look like for August?
>
> <A: John A. Haudrich> Look, we have line of sight. ***I think the Americas are looking pretty strong, and we're seeing some comeback in places like Northern Europe and in the U.K. And as John mentioned, we see Europe probably stabilizing in the second half of the year.***
>
> There is still significant consumer weakness in all of the regions, probably except for Latin America. But whether it's wine or beer in Europe, spirits in Europe still down compared to long-run averages in last year, driven spirits and say, wine is driven by the macroeconomic kind of trade issues.
>
> * * *
>
> So our story over the next 2 years is not a volume story or per se. We predicate sort of flat volumes, but getting much, much more efficient and getting much higher

> returns on the volumes we have. And I think for us, our thesis is that value will be increased through getting better returns rather than chasing volume at lower margins and lower prices in markets that are -- where demand is sluggish.
> . . .
>
> <Q: Bryan Nicholas Burgmeier – Citigroup Inc. – Associate> And just maybe generally, how do you feel about sort of European operating rates at this point?
>
> <A: John A. Haudrich> I think the net price pressure for the first half of the year is about $70 million, and we're thinking right now, it might be $100 million to $125 million down from our previous expectations.
>
> ***Really, really, there are two factors going on is that inflation has moderated probably more so than we expected. Energy prices have moderated. So that is definitely one of the drivers. And then we have seen probably reasonably stable net pricing and gross pricing in the business. If you take a look at our business year-to-date, our sales volumes are up about 1%, but gross price is down about 1%, right?***
>
> So it's not really fluctuating that much in the grand scheme of things. We thought it might be under a little bit more pressure. So it's really kind of both levers moving. And I would say like if we take a look at the back half of the year, most of the year-over-year pressure point has been incurred in the first half with a little bit still dribbling into the back half.

(Emphasis added).

*November 4, 2025*

31. On November 4, 2025, Defendants issued a press release announcing positive third quarter 2025 results. The press release reported that "[e]arnings before income taxes totaled $58 million, an improvement of $115 million" and its Europe operations "[s]egment operating profit increased to $95 million, up from $56 million in the prior year period, a 70 percent increase as margins improved 590 basis points." The press release also announced that O-I Glass was increasing "its full-year 2025 adjusted earnings guidance" and "expects full-year free cash flow to be between $150 million and $200 million, representing an improvement of approximately $300 million over the prior year."

32. As part of the press release, Defendant Hardie, highlighted the Company's disciplined pricing and higher quality revenue mix stating, in relevant part:

> ***We continue to make significant progress towards the targets set at our Investor Day earlier this year. Despite subdued demand, our stable top-line is underpinned by a higher quality of revenue, as we prioritize economic profit and take a disciplined approach to pricing, which includes tighter mix management and focus on expanding our business in attractive and growing categories. We continue to execute our Fit to Win initiative, delivering another $75 million of benefits in the third quarter and $220 million year-to-date. We are on pace to exceed our $250 million annual 2025 target for Fit to Win Benefits.*** As a result, O-I expects to achieve higher adjusted earnings, improved margins, greater free cash flow, and a healthier balance sheet in 2025.
>
> ***Given our solid performance, we are raising our full-year 2025 adjusted earnings guidance to $1.55 - $1.65 per share, nearly double last year's results. We expect continued momentum in 2026 and beyond, with further increases in adjusted earnings and free cash flow as we implement our strategy. Ongoing execution of Fit to Win sets O-I up well to achieve its 2027 objectives and transition to profitable growth beyond 2027.***
>
> (Emphasis added).

33. On November 5, 2025, Defendants conducted the corresponding earnings call. Defendant Hardie emphasized the Company's stable top line "supported by higher average selling prices and favorable FX" despite weak consumer demand and macroeconomic pressures, stating, in pertinent part:

> Last night, we reported third quarter adjusted earnings of $0.48 per share, delivering strong results that exceeded both last year's performance and our own initial plans. Our top line remained stable, supported by higher average selling prices and favorable FX, even as overall consumer demand remained subdued. We saw revenue growth in non-alcoholic beverages, food and RTDs, while beer and wine experienced declines due to softer consumer demand.
>
> ***Importantly, the execution of our strategic initiatives is leading to a higher quality of revenue as we strip out waste and inefficiencies, expand in growing categories and exit some unprofitable business.*** As a result, segment operating profit rose by more than 60% year-over-year, and margins are up a robust 570 basis points, propelled by significant benefits from our strategic program and increased production levels following last year's inventory reduction.

* * *

> ***Despite ongoing macroeconomic headwinds, our strategy is delivering results. We have raised our full year 2025 guidance and now expect adjusted earnings per share to nearly double versus 2024.*** Momentum is building, and we anticipate continued growth in adjusted earnings and free cash flow in 2026 as we advance towards the target set out at our recent Investor Day.

(Emphasis added).

34. On the same call, Defendant Haudrich highlighted the 70% increase in Europe's segment operating profit and raise in the Company's full year earnings guidance, stating, in relevant part:

> In Europe, segment operating profit surged by 70%, reflecting contributions from strategic initiatives and higher production following last year's inventory reductions. Net price was a headwind and sales volumes dipped due to a major capital project start-up. Importantly, volumes were about flat, excluding this event.
>
> ***In summary, segment operating profits increased significantly with strong gains in both the Americas and Europe, reflecting the continued success and disciplined execution of our key initiatives.***
>
> ***Looking ahead, our outlook for 2025 has improved. Given our strong year-to-date performance and the momentum of Fit to Win, we have raised our full year earnings guidance.*** We now expect adjusted earnings in the range of $1.55 to $1.65 per share, nearly double our 2024 results. This meaningful increase reflects stronger initiative benefits and better net price, partially offset by slightly lower sales volume.

(Emphasis added).

35. During the question-and-answer segment of the call, Defendants continued to minimize the European volume decline as temporary in the following exchanges:

> <Q: Michael Andrew Roxland – Truist Securities – Senior Analyst> Your European volumes declined 4% in 3Q. So, I'm just wondering how much of that volume decline in Europe was you guys walking away from unprofitable business, which your peers then possibly picked up versus, let's say, underlying consumer weakness?
>
> <A: John A. Haudrich> Yes, Mike, as we had indicated, overall, the number -- the shipments were down about 3% in Europe overall. We attribute that substantially

> to that major project that was underway. We talked about that last quarter. It was primarily in the spirits category. So that was the biggest impact.
>
> <A: Gordon J. Hardie> Yes. And just to add a bit of color on Europe for us, Mike. We kind of look at this in probably 3 parts. Southern Europe was very strong for us actually and strong growth in all categories and particularly waters, food, RTDs. In Western Europe, we were impacted a bit by wine with wine exports down and spirits, some of the French spirits not picking up yet in terms of shipments to either the U.S. or to China.
>
> ***Northern Europe was good, was strong for us across food and spirits and beer. And then, as John said, we had that commissioning, which was slower than we had anticipated. So, yes, we're pretty happy where we are in Europe, given the context there. We're very focused on improving the profitability of the volumes we have, and we're not chasing volume just for the sake of volume, and we're being very disciplined around that. As I said, there is volume out there that can destroy your margins and eat your cash, and that's not our game plan.***

(Emphasis added).

*February 10, 2026*

36. On February 10, 2026, Defendants issued a press release announcing fourth quarter 2025 results. The press release reported overall profitability in 2025 despite relatively stable sales driven by 13% increase in segment operating profit. Notably, the press release announced that the Company anticipated stronger 2026 results and reaffirmed O-I's 2027 Investor Day targets.

37. As part of the same press release, Defendant Hardie touted O-I Glass' strong 2025 results and continued success of its strategic initiatives, notwithstanding declining sales volume and weakness in European demand, stating, in part:

> We are making very solid progress against our strategic objectives, and our 2025 financial performance was consistent with our recent guidance. Net sales were relatively stable despite softer market demand, as we successfully navigated challenging market conditions and remained focused on optimizing our customer and product mix. This approach resulted in a more premium and resilient business portfolio. Fit to Win continues to be a core value driver for our business and delivered $300 million in benefits in 2025, significantly exceeding our original goal and driving meaningful performance improvement.

> ***Looking ahead, we anticipate continued progress in 2026, including another year of substantial Fit to Win benefits, despite ongoing market uncertainty and muted demand. We are also reaffirming our 2027 Investor Day financial targets and increasing our cumulative Fit to Win benefits to at least $750 million to further strengthen our competitiveness. As a result, we expect to drive higher earnings, enhance economic profit, strengthen free cash flow, and deliver sustainable, long-term value for shareholders.***

(Emphasis added).

38. The accompanying earnings call was held on February 11, 2026, Defendant Hardie remained optimistic despite the challenging market conditions and reaffirmed "2027 Investor Day financial targets," stating, in part:

> ***Looking ahead, we expect continued progress in 2026, including another strong year of Fit to Win execution even as market conditions remain challenging. We are reaffirming our 2027 Investor Day financial targets. Despite challenging end markets, we have increased our cumulative Fit to Win benefit target, reinforcing our confidence in achieving our 2027 adjusted EBITDA goal.*** As a result, we expect to continue improving earnings, expanding economic profit, strengthening free cash flow and delivering sustainable long-term value for shareholders.
>
> * * *
>
> Stepping back, we continue to operate in a challenging environment as the value chain works through the long tail of post-COVID normalization. ***Against this backdrop, we are taking a highly disciplined approach, enhancing our portfolio, executing Fit to Win and maintaining rigorous capital allocation, which positions us well as markets eventually recover. The common thread behind these results is execution, particularly Fit to Win***, which we will now discuss on Page 5. Fit to Win is a core value driver for our business. ***The effort continues to deliver significant cost reductions while optimizing our network and value chain. Cost discipline is not just defensive. Our cost mindset and discipline strengthens our competitive position, which is a critical engine to enable future profitable growth.***

(Emphasis added).

39. On the same call, Defendant Haudrich noted that actions to improve "Europe's operating trajectory" were expected to be completed by the first half of 2026, positioning the Company for continued operational improvement and stronger financial results, stating, in relevant part:

> ***Importantly, all actions to eliminate excess capacity are expected to be completed in the first half of 2026, materially improving Europe's operating trajectory. Overall, segment operating profit increased solidly, demonstrating disciplined execution and the continued success of our initiatives. Taken together, these trends inform our expectations for 2026,*** which I'll discuss on Page 8. Looking ahead, we expect to build on our momentum and deliver improved results in 2026. The top line should be stable or modestly higher, supported by slightly better gross price and favorable FX as sales volumes are expected to be flat or slightly down. ***As markets gradually stabilize, we will continue to optimize our portfolio, including exiting unprofitable business to improve economic profit while maintaining or growing market share. We anticipate adjusted EBITDA of $1.25 billion to $1.3 billion, representing up to 7% growth versus 2025. This includes an estimated $150 million energy cost step-up as favorable European energy contracts expired at year-end.***

(Emphasis added).

40. During the question-and-answer segment, Defendants highlighted the Company's accelerated savings strategy and confidence in achieving its 2027 financial targets in the following exchanges:

> <Q: Ghansham Panjabi – Robert W. Baird & Co. – Analyst> And then for -- as it relates to the expanded savings, $750 million versus $650 million plus before. Is that just a function of just the volumes being lower than you thought, and so you're taking additional actions? And then just one final clarification on the energy headwind of $150 million for 2026. Is that just a one and done? Will it just be specific to '26? Or will there be any sort of lingering impact 2027 onwards?
>
> <A: John A. Haudrich> Let me just start with that one. ***On the energy side, yes, the $150 million energy reset is pretty much a kind of a one and done.*** The contracts that we had that were multiyear contracts that expired at the end of the year were rates before the Ukraine war with Russia -- Russia war with Ukraine, I should say, and then -- which were at low rates. Those expired at the end of 2025. We have since been basically layering in contracts and hedges over the course of the last year. ***So we're substantially contracted on our energy exposure in 2026 in Europe. So we're confident about the $150 million, which is substantially at prices below current PTF, but still a ramp-up from where we were in the past.***
>
> <A: Gordon J. Hardie> And Ghansham, with regard to the additional savings, it really is not because of the volume. I think we pointed out in earlier calls and particularly on Investor Day, $650 million was the original target. And obviously, we had a bigger bucket to go after as the savings came faster than planned, almost 50% of the savings in the first 15 months and the organization's ability to go after and execute those savings, then we're able to get after some of the stuff that we saw

> embedded but didn't have a clear line of sight to, say, a year ago, now coming to fruition and being able to execute that. ***That obviously helps offset the volume, but it's not because of the volume, so to speak. I think there are separate issues. But certainly, it underpins our confidence in delivering our 2027 number.***
>
> . . .
>
> <Q: Anojja Aditi Shah – UBS Investment Bank – Analyst> I wanted to ask about the $750 million, the new cost savings target, not to take away from how impressive the performance has been, but you basically raised the cost savings target by $100 million, but kept the 2027 EBITDA the same. I assume that means that maybe your volumes are going to continue to offset. But is there anything else in there? Or what explains that -- can you reconcile that for us?
>
> <A: John A. Haudrich> ***Yes, the target of at least $1,450 remains in place, right? So we're not limiting ourselves to $1,450, at least $1,450. So we have increased a Fit to Win by $100 million. That does help mitigate the uncertainty around the commercial environment.***
>
> ***Of course, we are working to drive an improved commercial outlook for the business.*** Just back to the last discussion, we are building the system to be able to grow. As we've always said, it's going to be a little bit more of a horizon 2 target to drive the top line growth. ***But we are making some room given the uncertainty and the continued prolonged affordability challenges out there in the marketplace.***

(Emphasis added).

<u>*February 25, 2026*</u>

41. On February 25, 2026, Defendants presented at the Bank of America 2026 Global Agriculture and Materials Conference. Defendant Haudrich reaffirmed the Company's guidance despite anticipated early-year pressure, stating, in relevant part:

> ***We target this year, in 2026 at least $275 million of savings. And then we have a 3-year target of $750 million, which is actually -- we actually increased that target here recently. And to put it in perspective, $750 million of savings is about a 15% reduction in the cost base of our company.*** That will go a long way. That's going to be very important to be able to improve the competitiveness of our products in the marketplace.
>
> So what is this doing for us? We believe that we're making solid progress towards our 2027 Investor Day targets. EBITDA is improving. Margins are improving. Fit to Win is off to a great start. And in fact, we just -- as I mentioned, we increased

our targets there. Free cash flow has rebounded. Leverage is improving, and we've inverted into positive economic profitable growth.

***So that brings us to where we are right now in 2026. As you can see on the left-hand side, we expect an improved earnings, higher EBITDA, higher EPS, higher free cash flow and improved leverage on our way towards those Investor Day targets.***

* * *

So as we stand here today, the earnings quarterly allocation will be below the range that we've identified there. But again, we are not changing our full year view. ***We have additional Fit to Win opportunities we're pursuing. We're reasonably optimistic that through the negotiations we're doing, we'll see some additional sales volume opportunities over the balance of the year. That might come in a little bit later in the year as we work through things.***

(Emphasis added).

42. During the question-and-answer portion of the conference, Defendant Haudrich touted that the Company's Fit to Win savings were sufficient to achieve guidance even if other potential offsets did not occur, in the following exchanges:

<Q: George Leon Staphos > Now the $750 million, which was raised from $650 million. It was greater than $650 million, now it's greater than $750 million. So an incremental of $100 million roughly. Was there any of that, that was just related to the fact that as of last time you've given the guidance, the dollar was a lot stronger, and so there was some currency benefit.

<A: John A. Haudrich> Just to be clear, when we reconcile our earnings, which we do every quarter, we always pull FX out. It's its own line. It's the FX running through the revenue and the FX running through the cost, we pull those out. ***So when we show price, net price and volume and costs, including the Fit to Win benefits, they should be on an FX-neutral basis, on an annual basis. And then you can see the kind of the cumulative impact of FX on their earnings stream by just saying that one line. So it should be a pure cost savings number story.***

(Emphasis added).

*April 28, 2026*

43. On April 28, 2026, Defendants issued a press release announcing first quarter 2026 results. The press release reported that due to "higher global energy costs" and "additional net price pressure in Europe" the Company was revising "its 2026 guidance and now expects adjusted

earnings per share of $1.00–$1.50, compared with its prior outlook of $1.65– $1.90." Despite the European energy headwinds, Defendant Hardie remained confident in O-I Glass' Fit to Win strategy, touting its continued savings and the Company's ability to achieve its 2027 Investor Day targets, stating in pertinent part:

> Performance in the Americas was stable, and management acted quickly to address near-term headwinds in Europe. Volume trends improved as the quarter progressed, and several meaningful customer wins should position the business for stronger growth in the second half. With Fit to Win delivering strong savings, we remain focused on achieving our 2027 Investor Day objectives.

44. On April 29, 2026, Defendants conducted the corresponding earnings call. Defendant Hardie noted the "challenging European market, compounded by elevated energy inflation and broader macro dynamics" while continuing to tout Fit to Win's savings and expressing confidence that Europe's performance will improve "in the coming quarters," stated in pertinent part as follows:

> Europe is also earlier in the Fit to Win journey than the Americas, and we expect performance to improve in the coming quarters as we execute the restructuring actions we have announced.
>
> * * *
>
> ***Even with the near-term uncertainty, our strategy and priorities are unchanged. With continued Fit to Win execution and new business wins, we are confident we can strengthen results as the year progresses and expect to build momentum into '27 and beyond. We remain laser-focused on our investments -- Investor Day objectives, and we believe many of today's headwinds are temporary.***
>
> * * *
>
> ***Fit to Win remains a core value driver for O-I. The program continues to take cost out and optimize our footprint and value chain. Strengthening our cost position improves competitiveness and enables long-term profitable growth as demonstrated by new business wins. We are now at the halfway point towards delivering $750 million of cumulative benefits through 2027, and we remain ahead of schedule.*** In the first quarter, the team delivered gross Fit to Win benefits of about $50 million, in line with our expectations. Net benefits were $35 million after headwinds from external disruptions in the Americas and temporary transition costs as we complete the closure of three plants in Europe.

(Emphasis added).

45. On the same call, Defendant Haudrich detailed the financial performance and remained optimistic despite the challenging start to the quarter, in relevant part, as follows?

> ***Starting with the core glass business, demand trends are stabilizing as the year progresses and Fit to Win is continuing to deliver meaningful results.*** In the Americas, our outlook remains positive, and we expect results to be up year-over-year. ***In Europe, we have risk-adjusted our outlook by up to $25 million given elevated competitive pressures, net of additional cost actions and restructuring should support improved performance in the second half.*** The biggest swing factor in our updated guidance is macro-driven energy inflation stemming from conflicts in the Middle East, which could total $75 million to $100 million.
>
> Higher energy prices flow through natural gas, electricity, logistics and certain raw materials. ***Importantly, our proactive energy management practice significantly limit further exposure, particularly in Europe, where approximately 75% to 80% of gas requirements are protected at prices favorable to current market levels and higher protection in the colder winter months.***
>
> * * *
>
> ***While our 2026 outlook is conservatively set given macro uncertainty, our strategy and priorities remain unchanged, and we continue to drive towards the 2027 objectives we outlined at last year's Investor Day. We expect Fit to Win to deliver significant value next year, and we believe many of the pressures we are seeing in 2026 are temporary.*** More than half of our business operates under contractual price adjustment formulas that reflect changes in inflation on a lagging basis, providing an important structural mechanism as cost conditions evolve over time. ***Likewise, as capacity utilization increases, particularly in Europe, we believe our competitive position should continue to strengthen. Overall, we remain focused on the levers within our control, anchored by Fit to Win, and we are determined to deliver the best possible performance this year while building momentum into 2027.***

(Emphasis added).

46. Defendant Hardie further commented on the Company's outlook, doubling down on its prior narrative and reaffirming the effectiveness of its Fit to Win strategy, asserting a "clear line of sight" to profitable growth and commitment to achieving its 2027 Investor Day targets, stating in pertinent part:

> ***Fit to Win is delivering and continues to enable future profitable growth by improving operational discipline and cost competitiveness across the business. Core glass demand is stabilizing and recent trends are increasingly encouraging. March volumes point to a clear turning point in demand, providing early evidence that our actions are beginning to translate into profitable growth in the second half and beyond.*** Improving competitiveness across the footprint is already converting commercial opportunities. We have 15 confirmed incremental volume wins in hand, yielding approximately 1.5% annualized growth. These ramp up over '26 and into '27, giving us a clear line of sight to profitable, sustainable growth.
>
> * * *
>
> In Europe, Fit to Win execution is accelerating. While the region trails the Americas by roughly 6 to 9 months, our capacity rationalization and restructuring actions are underway.
>
> ***Our competitive position continues to strengthen, especially as capacity utilization improves. While we conservatively risk-adjusted our 2026 outlook to reflect Europe's operating environment and the energy backdrop, we remain committed to our 2027 Investor Day targets. We believe these headwinds are temporary and manageable. Taken together, O-I today is a more disciplined, better balanced and better positioned for durable growth than at any point in recent years.***

(Emphasis added).

47. During the question-and-answer segment of the call, Defendants reiterated confidence in its Fit to Win strategy, portraying Europe's weakness as temporary and reaffirming a clear path to profitable growth despite elevated energy costs in the following exchanges:

> <Q: Michael Andrew Roxland – Truist Securities, Inc. – Analyst> Gordon, I just wanted to follow up with you on the new business wins across 15 accounts, and you said spanning all categories. Is that mostly Europe? Because you just said a lot of the commentary in terms of your response to George's question, it sounded like there's a lot of new business wins in Europe. So can you just comment about those new accounts, the breakdown between, let's say, Europe versus the Americas and what end markets you're really seeing that growth come from?
>
> <A: Gordon J. Hardie> ***So we -- the way we've set up our business is -- and our sales forces and go-to-market is a category and sales combo. And so we see opportunities in each of the categories, and we're executing those, I think, quite effectively. We expect that momentum of new business wins to continue as we translate cost reduction into competitiveness. And if I take people back to I Day, the overall strategy is for us to get our cost base way down, and we're doing that. We still have quite a way to go to be the lowest cost producer, but we're making***

***tremendous progress and then sharing some of that productivity with key strategic customers in exchange for profitable growth.***

<Q: Michael Andrew Roxland – Truist Securities, Inc. – Analyst> And then just one quick follow-up. Just you mentioned remain focused on 2027 targets, including EBITDA of $1.5 billion plus. Your 2026 guide is down about $100 million at the midpoint. So obviously, that's a setback. Can you help us bridge how -- roughly how you intend to get to the 2027 guide right now?

<A: Gordon J. Hardie> ***we are absolutely laser-focused on our 2027 Investor Day targets, of which one is $1.45 billion, okay? There's no question that this is a setback this year, but we're absolutely clear that we have a viable path to that $1.45 billion. And let me give you probably two, three -- three points. We've already laid out that we have $150 million of Fit to Win to come in 2027***. And a significant part of our business is in -- has what we call PAFs, price adjustment formulas that are lagged formulas that will allow us to catch up on some of the inflation this year in next year. And we're also, as I said, starting to deliver and move in, in more and more of the markets into the profitable growth phase of our strategy, which also should help us bridge that gap.

***We've tended to outperform on Fit to Win. So there's also the opportunity to do better than that $150 million, and we're ruthlessly focused on stripping waste and inefficiency out of the business and out of the chain. So when we put all that together, yes, is it a bit of a steeper climb, but absolutely achievable.*** And in every difficulty, there's an opportunity. And I think the opportunity for us here is to even get more focus and to move even at a faster pace to get to where we need to go.
. . .

<Q: Anthony James Pettinari – Citigroup, Inc. – Analyst> I guess the basis of the question is you were breakeven in Europe in 1Q. I assume smaller producers are doing much worse. And I'm just curious how sustainable that's been historically? And then I guess, related question, is it fair to say you're giving up a little bit of share in Southern Europe and maintaining or maybe even growing in Northern Europe?

<A: John A. Haudrich> If you compare that to Europe, that probably going into the year -- and I think we brought this up during the last call is that we were -- the market was probably more in the low 90s, right? But there is significant amount of announced capacity closures underway. ***We're -- as we said, we're going to complete the work that we're doing by midyear. We believe from what we can see is even net of new capacity additions, you're getting into a very similar spot that you see in the Americas. So a much more supply-demand balance. And as a result, it gives us confidence that as we go forward, what we saw in the Americas, we could replicate over in Europe. And truth, yes, it's a more fragmented base in Europe than it is in the Americas. But if you look at the whole, the capacity utilization road map seems to be improving.***

<A: Gordon J. Hardie> Just in addition to that, Anthony, as we laid out at I Day, our cost base was too high. We've made significant progress on that further along in the Americas, as I said. But we also see tremendous further opportunity to get our cost base way down, and that is a key focus for us so that we can compete and deliver our commitments in any environment. ***So a bit to go there, but that is fundamental to our strategy. And then we're -- it's not really up to us to comment how anybody else is doing. But we're crystal clear on what we need to do. We're crystal clear on the point on the cost curve where we need to be at to grow profitably, and we are absolutely determined to get there and have a clear line of sight on how to do it.***

(Emphasis added).

*June 10, 2026*

48. On June 10, 2026, Defendants presented at the 16th Annual Wells Fargo Industrials & Materials Conference. Defendant Hardie touted the "excellent execution" of its Fit to Win program and reaffirmed 2026 adjusted EBITDA outlook while guidance he success of its Fit to Win program noting it was "on track" to meet its increased $750 million target, and contribute to the Company's ability to achieve its 2027 Investor Day targets despite the European headwinds, stating in relevant part:

***And we continue to see excellent execution around our Fit to Win program, our proximity to customer and our businesses gaining share and improving their earnings. Between '24 and '26, operating profit in the Americas up about 60%.***

* * *

And while April and May were still soft volumes in Europe, ***we are starting to see an uptick in volumes in June and a very strong delivery of our Fit to Win cost-out program. Our balance sheet is strong. We have strong liquidity.*** And overall, I would say, in all markets, demand is still soft. Consumers are still challenged from an inflationary point of view. And now with the additional energy costs, we see some of that continuing to play out. That notwithstanding, as we get fitter, we get more competitive.

* * *

***We maintain our kind of outlook for the full year guidance of somewhere between $1.125 billion and $1.225 billion. So softer start than expected, driven primarily by energy and softer demand, particularly in Europe, but an accelerating Fit to***

> ***Win program. We set out at the start of the year about 250, we expect to beat that. And that then sets us up for a fast start in 2027.***
>
> So the fundamental thesis is we transformed the cost base well on track. So we -- by the end of this year, we'll have taken north of $0.5 billion of cost out of the business. Typically, that is -- that's practically 80% of the initial $650 million target there or thereabouts. We've upped that target to $750 million and probably see opportunities above that. Typically, these kind of programs, if you haven't got 30% out in the first 15 months program probably isn't going to deliver. ***What we've been able to demonstrate in the first 15 months is we've got north of 45% out and are well on track to either deliver or outperform the $750 million.***
>
> * * *
>
> ***So we're starting to see that shift in premiumizing the portfolio as well as becoming more competitive in mainstream. We're very clear on where we play and how we win across each geography, and we have clear category and market strategies in place for that. And the overriding kind of metric for us is, is it economically profitable.***
>
> * * *
>
> So overall, our thesis is robust despite a kind of softer start to the year. ***And as we look forward into next year, while the path to $1.45 billion is steeper, we absolutely see a path there. Is there less margin for error. Absolutely, but we still see a path to $1.45 billion. So yes. Yes. So that's really our strategy is get fit, turn that fitness into competitiveness and then access the volume growth that's in the market. And then by 2028, that gives us the optionality to look at different forms of capital management and also how we expand into new geographies or new categories.***

(Emphasis added).

49. During the question-and-answer segment of the conference, Defendants continued to reaffirm the achievability of the $1.45 billion 2027 target and noted that Europe was in the "final stages" of executing its Fit to Win cost reductions in the following exchanges:

> <Q: Gabrial Shane Hajde – Wells Fargo Securities, LLC – Analyst> And then what's driving the weakness in Europe? I know you mentioned energy.
>
> <A: Gordon J. Hardie> Europe, we're probably, as I said, 6 to 10 months behind the execution of getting the costs out. And we're now in the final stages. And over the summer, we will have executed everything that we announced. That notwithstanding soft demand practically across every category in Europe, but primarily in the wine segment, where wine volumes have been dropping out for 3 to 4 years at somewhere between mid- to high single digits and resulting in overcapacity and downward price and margin pressure.

> ***Through our Fit to Win process, which the business there has executed well within the confines of the rules and regulations, has allowed us to be more competitive. So we've been able to defend some of the volumes that we had. But there are other pockets, particularly in wine, where we said there is just no economic value to us being in those categories or with those customers, and we have shed those volumes. Food operating well for us, premium beer operating well for us. And with being more competitive and revitalizing our go-to-market system, we've seen a fair chunk of those 15 customers in Europe and picking up.***
>
> <Q: Gabrial Shane Hajde – Wells Fargo Securities, LLC – Analyst> But can you talk about what has to go right or if we kind of stay in this, I mean, we're reading articles about more conflict with the Middle East. I'm assuming the longer that persists, it's going to make it tougher in Europe from a volume standpoint, consumer affordability, all the things we read about. Anything else that you have.
>
> <A: Gordon J. Hardie> So no question, the current environment and the energy -- the incremental energy because we've more or less solved for the 150 energy reset. It's the incremental indirect energy piece that's hitting us. Does that make it a steeper climb to 1.45? Yes, it does. Is there a less margin for error. Yes. ***That said, we still see a very clear path. It's down to controlling what we control within that, and we're confident we can do that. And then the rest is really the external, how the consumer kind of responds.***

50. The above statements in Paragraphs 20 to 49 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected targeted cost savings and anticipated earnings on the back of its Fit to Win program continued expansion of its core platform, AI-driven investments, increasing enterprise adoption and multi-product integration. In truth, the Company was seeing higher than expected expenses associated with plant closures and restructuring, operational disruptions that materially offset Fit to Win benefits, and continued energy-cost pressures affecting its European operations, making O-I Glass' $1.45 billion 2027 Investor Day financial target increasingly unlikely to be met. Defendants misled investors by providing the public with materially flawed statements of confidence cost savings and growth projections which did not account for these variables.

***The Truth Emerges During O-I Glass' Second Quarter Earnings Report***

*July 28, 2026*

51. On July 28, 2026, Defendants published a release announcing their second quarter 2026 results that fell materially below expectations and accordingly "revised it 2026 guidance and realigned its 2027 targets to reflect current business headwinds and a more gradual rate of improvement," stating as follows:

- Net sales were nearly $1.7 billion, down 2 percent from the prior year, as favorable currency translation and stable selling prices partially offset a 4.5 percent decline in sales volumes2, which improved through the quarter.
- Reported earnings were a loss of $6.33 per share, including a $873 million non-cash goodwill impairment charge and a $96 million increase to deferred tax valuation allowances, both related to Europe.
- Europe segment operating profit was $6 million, reflecting competitive pricing pressure, elevated energy costs and temporary operational disruption following major restructuring actions.
- Fit to Win delivered $65 million of gross benefits and $50 million savings of net of operating disruptions.

52. Defendant Hardie was quoted on the release, blaming the shortfall on "commercial pressures, higher energy-related costs and operational challenges in Europe" stating in pertinent part:

> Achieving our objectives in Europe is taking longer than expected due to persistent market challenges, including commercial pressures and higher energy related costs. While we believe these challenges are temporary, we have adjusted our 2026 outlook and realigned our 2027 targets to reflect a more gradual pace of improvement.

53. During the corresponding earnings call held on July 29, 2026, Defendant Haudrich attempted to downplay the substantial European shortfall continuing to characterize it as a "temporary disruption," pertinently stating the following:

> Segment operating profit was $6 million compared to $90 million last year. The decline primarily reflected unfavorable net price from competitive pressures and higher energy costs. ***Europe delivered solid gross Fit to Win benefits, but***

> ***temporary operational disruption and inefficiencies prevented those benefits from translating into net savings.***
>
> * * *
>
> As Gordon noted, lower current year guidance is primarily driven by 3 factors in Europe: continued market challenges, including additional price pressure and higher energy costs related to the Middle East conflict, adjusted Fit to Win timing due to temporary operational disruption and additional costs at a few specific plants.

(Emphasis added).

54. Defendants pertinently elaborated further on the European slowdown and O-I Glass' updated 2026 full year guidance and realignment of its 2027 targets during the following pertinent exchanges

> <Q: Michael Andrew Roxland – Truist Securities, Inc. – Analyst > You mentioned, Gordon, that you don't believe that the -- what you're seeing in Europe is structural. What gives you confidence that it's really not a structural issue in Europe? And what I'm trying to get is when I look at some of your peers that recently reported, one of your peers reported close to a 30% EBITDA margin in the first half.
>
> <A: Gordon J. Hardie> ***Yes, we've had a stumble, a chunk of it of our own making. We own that. We know how to fix it. We know what the issues are. We have the right resources in place. We've made the required changes of leadership and have now leadership in place with the skills that can address the supply chain network issues that we're facing.*** So we see ourselves being able to execute that in the months and quarters ahead to the standard that we've done in the Americas. And we have the right resources and governance around that. We expect within 2 years to be back at kind of high teens margins. And that's assuming energy markets somewhat normalize -- there's some demand coming back into the market in certain categories.
>
> * * *
>
> ***So there's a lot of good things happening in Europe. We're making a lot of progress in a lot of areas. But we did have this stumble that is sort of masking that. We feel we're working through that. By year-end, we'll have settled the supply chain significantly, and we'll start to extract the full value of the restructuring and the capacity optimization.*** So we have a lot of data points we feel gives us confidence that we can execute in a way that delivers into the high teens over the next 18, 24 months.
>
> . . .
>
> <Q: George Leon Staphos – Bank of America, Research Division – Managing Director> And as we think about Europe and some of the changes in the organization that we've seen over there, has that been because of alignment on the

> direction and the strategy or just execution and going out of parameters in terms of the execution?
>
> <A: Gordon J. Hardie> I think one of the things that became apparent as we move through the second quarter is the -- is the extent to which we needed to work cross-functionally. ***And I did flag up on Investor Day that our goal was to get this business out of silos and working much more cross-functionally. And we've made huge progress on that. But I don't think we made enough progress on that in Europe, right?***
>
> * * *
>
> ***The other thing I would say is, as we -- one question you ask is, is Fit to Win the cause of some of these breakdowns? And again, the answer is absolutely no because what we've done on Fit to Win is strip out cost and waste, and we've actually upped our reinvestment in maintenance and engineering across the fleet over the last 2 years. And our engineering and maintenance has actually increased slightly on a per ton basis.***
>
> So this is really cultural change, process change that we're bedding in. We have huge support from the plants on TOE and huge support from people on the line. They see their lives getting easier in managing these plants. So I think we're in a good place. We stumbled in Europe, no question about that. We own that. We know what went wrong. We know what the root causes are. We're all over the root causes, and we're fixing it. So I expect that performance, the operational performance to continue to improve in the Americas, and I expect it to pick up a much faster pace in the next 2 to 4 quarters in Europe.

(Emphasis added).

55. The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made above. Defendants continually praised the progress of the Fit to Win program, touted its substantial cost-saving benefits and reaffirmed O-I Glass' 2026 financial outlook and 2027 Investor Day targets, while continually minimizing risks posed by cost-saving delays in its Fit to Win strategy, higher than expected expenses, operational disruptions and continued commercial and energy-cost pressures affecting its European operations.

56. Investors and analysts reacted immediately to O-I Glass' revelation. The price of O-I Glass' common stock declined from a closing market price of $9.06 per share on July 28, 2026, O-I Glass' stock price fell to $7.70 per share on July 29, 2026, a decline of about 15%.

57. A number of well-known analysts who had been following O-I Glass lowered their price targets in response to O-I Glass' disclosures. For example, Truist Securities lowered its price target to $10.00 from $13.00 noting that, "[i]n Europe, demand remained weak while selling prices declined due to compounded by poor execution stemming from three plant rationalizations in France..."

58. Similarly, UBS lowered its price target 26% commenting, "OI is pointing to improving performance in 2H with LSD volume growth on a consolidated basis, implying FY26 volumes down slightly. OI notes volumes were flat in June. However, investors have heard this before and will likely be skeptical on any 2H volume improvement…Management cites operating disruptions pushing out timing, but this is disappointing."

59. Baird Equity Research cut its price target to $13.00 from $15.00, noting, "the company also having been impacted by operational inefficiencies in context of the current restructuring program/capacity curtailment initiatives…EPS has declined from ~$1.60 in 2025 (~$3.10 in 2023) to our revised $0.50 forecast for 2026 – translating into negative FCF (~$100 million at the midpoint.).

60. The fact that these analysts, and others discussed O-I Glass' shortfall and below-expectation projections suggests the public placed significant weight on O-I Glass' prior earnings and growth estimates. The frequent, in-depth discussion of O-I Glass' shortfall confirms that Defendants' statements during the Class Period were material.

***Additional Scienter Allegations***

61. During the Class Period, Defendants acted with scienter in that they knew, should have known, or otherwise were deliberately reckless in not knowing that the public statements disseminated on behalf of O-I Glass were materially false and misleading at the time they were made. Defendants had actual knowledge of, or access to, non-public information concerning the Company's Fit to Win program, specifically the timing and effectiveness of its implementation in Europe and amount of expected cost savings.

62. Notwithstanding such, Defendants repeatedly and affirmatively represented to investors that O-I Glass' Fit to Win strategy was delivering meaningful cost savings, improving the Company's competitiveness, while characterizing the headwinds facing its European operations as temporary and that the Company remained on track to achieve its $1.45 billion 2027 Investor Day target.

63. Defendants' scienter was further evidenced by their repeated claims of confidence that O-I Glass' European operations would improve despite their knowledge of the operational inefficiencies and disruptions associated with the Company's restructuring and capacity curtailment, as well as the persistent commercial pressures, and elevated energy costs affecting Europe. Defendants continued to characterize these challenges as temporary while failing to disclose the extent that these conditions were impairing the profitability in its European operations.

64. Moreover, Defendants knew or deliberately disregarded that the Company's 2026 full year outlook and 2027 Investor Day targets would be directly impacted by continued headwinds facing its Europe operations. Defendants knew or deliberately disregarded the weak demand and volume pressure facing its European operations, particularly in alcohol-related end markets. Despite such knowledge, Defendants continually minimized the European weakness and

characterized them as "temporary" while reaffirming 2026 full year guidance and publicly touting the Company's Fit to Win strategy, expected cost savings, and ability to achieve its 2027 Investor Day targets.

### *Loss Causation and Economic Loss*

65. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of O-I Glass' common stock and operated as a fraud or deceit on Class Period purchasers of O-I Glass' common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of O-I Glass' common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of O-I Glass' common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

66. O-I Glass' stock price fell in response to the corrective event on July 28, 2026, as alleged *supra*. On July 28, 2026, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning the Company's 2026 financial outlook and the true state of its European operations.

67. In particular, on July 28, 2026, O-I Glass announced results for the second quarter 2026 significantly below expectations, including an approximately 25% year-over-year decline in adjusted EBITDA and a substantial shortfall in its European operations. O-I Glass further revised its 2026 outlook and realigned their previously stated 2027 Investor Day targets.

***Presumption of Reliance; Fraud-On-The-Market***

68. At all relevant times, the market for O-I Glass' common stock was an efficient market for the following reasons, among others:

(a) O-I Glass' common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b) O-I Glass communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c) O-I Glass was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d) Unexpected material news about O-I Glass was reflected in and incorporated into the Company's stock price during the Class Period.

69. As a result of the foregoing, the market for O-I Glass' common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in O-I Glass' stock price. Under these circumstances, all purchasers of O-I Glass' common stock during the Class Period suffered similar injury through their purchase of O-I Glass' common stock at artificially inflated prices, and a presumption of reliance applies.

70. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United*

*States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

***No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine***

71. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with earnings projections while at the same time failing to maintain adequate forecasting processes or otherwise publicly disclose known adverse conditions of its European operations. Defendants provided the public with forecasts that failed to account for higher-than-anticipated operating costs and elevated energy costs in Europe and/or failed to adequately disclose that the Company at the current time did not have adequate forecasting processes.

72. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

73. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of O-I Glass who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of

future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

74. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired O-I Glass' common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

75. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, O-I Glass' common stock were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by O-I Glass or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of June 30, 2026, there were 153 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

76. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

77. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

78. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of O-I Glass;

(c) whether the Individual Defendants caused O-I Glass to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of O-I Glass' common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

79. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder*

80. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

81. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

82. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of O-I Glass common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire O-I Glass' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

83. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly

and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for O-I Glass' securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

84. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

85. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of O-I Glass' internal affairs.

86. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to O-I Glass'

businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of O-I Glass' common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired O-I Glass' common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

87. During the Class Period, O-I Glass' common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of O-I Glass' common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of O-I Glass' common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of O-I Glass' common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

88. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

89. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**

***Against the Individual Defendants***
***for Violations of Section 20(a) of the Exchange Act***

90. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

91. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about O-I Glass' misstatements.

92. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by O-I Glass which had become materially false or misleading.

93. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which O-I Glass disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause O-I Glass to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning

of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of O-I Glass' common stock.

94. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause O-I Glass to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

95. By reason of the above conduct, the Individual Defendants and/or O-I Glass are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: October 29, 2026

Respectfully submitted,

*/s/ James R. Cummins*
**CUMMINS LAW LLC**
James R. Cummins (0000861)
312 Walnut Street, Suite 1530
Cincinnati, Ohio 45202
Tel: (513) 721-9000
Fax: (513) 721-9001
Email: jcummins@cumminslaw.us

-and-

**LEVI & KORSINSKY LLP**
Adam M. Apton (*pro hac vice* forthcoming)
33 Whitehall Street, 27th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff Thomas Bryan*